**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br>vs.<br><br>**ROBERT GANDY,<br>SILVERBACK PROMOTIONS, LLC,<br>CLARENCE FITCHETT,<br>CF3 ENTERPRISES, LLC,<br>KATHY GIVENS-GANDY, AND<br>BILLY CHANG,**<br><br>Defendants. | Case No.:  4:21-cv-3672 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants Robert Gandy ("Gandy"), Silverback Promotions, LLC ("Silverback"), Clarence Fitchett ("Fitchett"), CF3 Enterprises, LLC ("CF3"), Kathy Givens-Gandy ("Givens-Gandy"), and Billy Chang ("Chang") (collectively "Defendants"), and respectfully shows the Court as follows:

## I.
## SUMMARY

1.      In 2017 and 2018, Defendants engaged in two different fraudulent schemes to obtain securities of two penny-stock companies and then to sell those securities into the market. To accomplish their scheme, the Defendants falsified documents that created the false appearance that the securities were unrestricted, and therefore avoid compliance with other requirements, such as registration with the Commission.  CF3, controlled by Fitchett, obtained shares of Quantum Medical Transport, Inc. ("DRWN") and Macau Capital Investment, Inc.

("MCIM") at virtually no cost by creating fictitious debts and fabricating various instruments that caused the transfer agent to issue millions of shares of stock of the two companies without restrictive legends.  Defendants also fabricated backdated promissory notes that were convertible into the unrestricted shares and sold the notes to unwitting third parties, who exercised the conversion option and sold the shares into the public market.

2.     Gandy, Silverback, Fitchett, and CF3 (collectively, the "CF3 Defendants") executed the first scheme by using Section 3(a)(10) of the Securities Act of 1933 ("Securities Act").  Under that section, a company may issue unrestricted stock in exchange for the satisfaction of a *bona fide* debt that the company owes—but only if the exchange is approved by a court at a fairness hearing.  In this case, the CF3 Defendants created fictitious debts that DRWN and MCIM purportedly owed to other parties.  Through false purchase agreements, CF3 purported to buy the fictitious debts from the creditors.  CF3 filed lawsuits in a Florida state court to collect on the fictitious purchased debts and sought court approval of sham settlement agreements that authorized CF3 to be paid with unrestricted shares in DRWN and MCIM.  With court approvals in hand, CF3 deceived the transfer agent into issuing unrestricted shares in DRWN and MCIM to CF3 based on false information.

3.     CF3 then attempted to deposit the unrestricted shares into its brokerage account, so that it could sell them into the market.  However, the brokerage firm refused to allow CF3 to deposit the shares.

4.     Undeterred, the Defendants shifted to another scheme that Gandy had used successfully in the past: creating fraudulent backdated convertible promissory notes to repay fictitious debts.  Gandy had previously employed that fraudulent scheme in 2012 and 2013 ("2013 convertible note scheme").  The Commission sued him for fraud in connection with that

scheme and obtained a final judgment against him. *SEC v. Robert Gandy, et al.*, No. 4:13-cv-2233 (S.D. Tex. July 2013). In a convertible note scheme, the perpetrator relies on a third party to buy the forged and backdated convertible promissory note. The third party converts the note into unrestricted shares of stock of the penny-stock company, sells the shares into the market, and then often times pays the perpetrator with the proceeds from the stock sales. The shares, being converted from an allegedly *bona fide* debt, are unrestricted. In this way, the perpetrator obtains proceeds from the sale of these shares without having given anything of value for them.

5. In this case, Defendants Givens-Gandy and Chang sold fraudulent backdated promissory notes purportedly issued by DRWN, and CF3 sold shares from a convertible note purportedly issued by MCIM. Most of the proceeds from these note sales were then transferred to bank accounts for Silverback, controlled by Gandy, and CF3, controlled by Fitchett. Defendants obtained profits from the stock sales to which they were not entitled—because the debts were fictitious and not *bona fide*, and the issued stock should have been restricted from sale. The sales occurred only because of the fake documents and fraudulent scheme orchestrated by Gandy.

6. The Defendants undermined the integrity of the securities markets by fabricating documents, misleading and manipulating courts, deceiving licensed transfer agents, and ultimately selling stock that failed to comply with federal registration requirements. Through their actions, Defendants have violated and, unless enjoined, will continue to violate the antifraud provisions of the federal securities laws, specifically Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

7.     To protect the public from further fraudulent activity, the Commission brings this action against the Defendants and seeks: (i) permanent injunctive relief; (ii) an order barring Gandy and Fitchett from participating in the offer or sale of securities pursuant to, or claiming an exemption under, Section 3(a)(10) of the Securities Act; (iii) an order barring Fitchett from participating in any offering of a penny stock; (iv) disgorgement of ill-gotten gains, plus prejudgment interest, against all Defendants, on a joint and several basis between Silverback and Gandy, and between CF3 and Fitchett; and (v) civil penalties.

## II.
## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this action under Sections 20(b), 20(d), 20(g), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(g), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

9.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

10.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Gandy, Silverback, Givens-Gandy, and Chang reside and/or conduct business in the Southern District of Texas.

# III.
# PARTIES

11.     **Robert Gandy**, age 56, resides in Katy, Texas.  Gandy is the founder and, at all relevant times, was the Managing Member of Silverback.  In 2013, the Commission sued Gandy for violating the federal securities laws in the 2013 convertible note scheme, which involved fraudulent backdated convertible promissory notes.  *SEC v. Robert Gandy, et al.*, No. 4:13-cv-2233 (S.D. Tex.).  In May 2015, Gandy consented to the entry of a Final Judgment, in which he was permanently enjoined from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, permanently barred from participating in any offering of penny stock, and ordered to pay disgorgement of $113,762, and prejudgment interest of $14,548, for a total of $128,310.  *SEC v. Robert Gandy, et al.*, No. 4:13-cv-2233 (S.D. Tex.) (Dkt. 44.).  Gandy is delinquent on paying judgment.

12.     **Silverback Promotions, LLC**, is a Texas limited liability company founded by Gandy in May 2014, with its principal place of business in Katy, Texas.  It is wholly owned and controlled by Gandy.

13.     **Clarence Fitchett**, age 57, resides in Pomona, New York.  Fitchett is the founder and, all relevant times, was the sole owner of CF3, and is listed as the signor on its bank accounts.

14.     **CF3 Enterprises, LLC**, is a New York limited liability company founded in December 2013, with its principal place of business in Pomona, New York.  It is wholly owned and controlled by Fitchett.

15.     **Kathy Givens-Gandy**, age 57, resides in Katy, Texas.  Givens-Gandy is married to Gandy and, at all relevant times, was listed as the signor and trustee of a bank account titled "Silverback Promotions Trust I."

16.     **Billy Chang**, age 36, resides in Spring, Texas.  Since 2010, Chang has been licensed with the Texas State Board of Pharmacy.

### IV.
### RELATED ENTITIES

17.     **Quantum Medical Transport, Inc.** (herein "DRWN") is a penny-stock company, incorporated in Delaware with headquarters in Sugar Land, Texas, and was formerly known as A Clean Slate, Inc.  The company claims to be a medical transportation and technology services company, and its stock was quoted on OTC Link under the ticker symbol "DRWN."  OTC Link is an electronic quotation system that displays stock quotes from broker-dealers for securities of penny-stock companies.  DRWN does not have a class of securities registered pursuant to Section 12 of the Exchange Act or a current reporting obligation pursuant to Section 15(d) of the Exchange Act.

18.     **Macau Capital Investment, Inc.** (hereinafter "MCIM") is a penny-stock company, incorporated in Delaware with headquarters in Houston, Texas.  The company claims to be a waste management holding company, and its stock was quoted on OTC Link under the ticker symbol "MCIM."  MCIM does not have a class of securities registered pursuant to Section 12 of the Exchange Act or a current reporting obligation pursuant to Section 15(d) of the Exchange Act.

### V.
### STATEMENT OF FACTS

**A.     Background and Overview.**

19.     Gandy and Fitchett and the two companies they controlled, Silverback and CF3 (hereinafter collectively referred to as the "CF3 Defendants"), targeted two penny-stock companies, DRWN and MCIM, for their schemes.  In order to set the schemes in motion, the

CF3 Defendants first engaged in a reverse merger between a private company and each penny-stock company.  Gandy identified the controlling shareholder of both DRWN and MCIM and coordinated the merger transactions, the announcements of change of control in the companies, and the appointment of new management.  After the reverse mergers were completed, Gandy and Fitchett created fictitious outstanding debts for DRWN and MCIM and subsequently consolidated the debts in CF3's name.

20.     On April 5, 2017, DRWN announced that it had closed a reverse merger with Quantum Medical Holdings, Inc., a Texas corporation.  As a result of the merger, DRWN's prior owner resigned from the company and a new sole owner and director ("DRWN President") was announced.  The individual identified as the DRWN President was acquainted with Gandy, but had no idea that he had been named DRWN's President.

21.     On October 4, 2017, MCIM announced that it had closed a reverse merger with ECO Medical Waste Holdings, Inc., a Texas corporation ("ECO").  As a result of the merger, MCIM's prior owner resigned from the company, and ECO's president and owner was announced as president and sole director of the new company ("MCIM President").

**B.     The Section 3(a)(10) Transactions**

22.     In the summer of 2017, Gandy began implementing his scheme to obtain unrestricted shares in both penny-stock companies.  This scheme relied on Section 3(a)(10) of the Securities Act, which exempts from the registration requirements of the federal securities laws the offers and sales of securities in specified exchange transactions.  In these exempted exchange transactions, securities can be issued in exchange for *bona fide* debts, claims, or property interests.  As a prerequisite, a court or other governmental entity must hold a fairness hearing on the terms and conditions of the transaction and approve it.  The hearing must be open

to the public, and notice must be given to all parties.  [15 U.S.C. § 77c(a)(10)].  Under Section 3(a)(10), an issuer can agree to discharge a *bona fide* debt it owes to a debt holder by exchanging it for unrestricted shares of its stock, which can be issued to the debt holder, if a court approves the transaction at a fairness hearing.

23.    The CF3 Defendants engineered two transactions that gave the appearance of complying with Section 3(a)(10), one for DRWN and one for MCIM.  However, these transactions were based on multiple false documents and forged signatures.  The purported debts were fictitious, and the signatures of the DRWN and MCIM executives were forged, thereby making the subsequent fairness hearings to approve the fraudulent transactions a sham.

### 1.    *The Section 3(a)(10) Transaction for DRWN*

24.    On September 29, 2017, CF3 filed its first lawsuit in a Florida state court, seeking a fairness hearing under Section 3(a)(10) in order to exchange debt for DRWN shares.  *CF3 Enterprises, LLC v. Quantum Medical Transport, Inc. f/k/a/ A Clean Slate, Inc.*, Case No. 17-018169 (Fla. Broward Cty. Ct. 2017).  In its lawsuit, CF3 claimed that it was entitled to collect $1,451,000 on multiple debts that DRWN allegedly owed to various creditors.  CF3 claimed to have purchased these debts from the creditors and, as a result, owned the debts.  But, at least three of the debts listed in the lawsuit were not *bona fide*.[1]

25.    The non-*bona fide* debts contained in the lawsuit included: (i) an August 9, 2017 professional services agreement between Silverback and DRWN, in the amount of $110,000 ("Silverback-DRWN PSA"); (ii) an August 21, 2017 contract between DRWN and INS Consulting, LLC ("INS"), for $100,000 in advertising services ("INS-DRWN contract"); and (iii) an August 5, 2017 invoice for $10,000 from CF3 to DRWN, allegedly for legal fees.

---

[1]    The lawsuit that CF3 filed against DRWN listed debts DRWN allegedly owed to other creditors and that CF3 had allegedly purchased.  The Commission currently has insufficient information to determine whether those were *bona fide* debts.

### a.    The DRWN "Debts"

26.    The Silverback-DRWN PSA was signed by Gandy and, allegedly, DRWN's President.  It provided that DRWN had retained Silverback "to gather personal and business information and to act as a business consultant…."  This was simply a contract to perform services in the future (at best) and not a debt or current liability of the company.

27.    Gandy also facilitated the INS-DRWN contract.  The $100,000 agreement was signed by INS's owner and, purportedly, DRWN's President.  The advertising agreement indicated that DRWN had retained INS to provide digital marketing services.  In entering this agreement, INS's owner only dealt with Gandy on behalf of DRWN.

28.    At the time that these debts were created (August 9, 2017 and August 21, 2017, respectively), the individual listed as the DRWN President on these documents was not aware he had been appointed president and director of DRWN.  Moreover, he did not sign or authorize the signing of the Silverback-DRWN PSA or the INS-DRWN agreement.

29.    The third non-*bona fide* debt appeared to be an obligation for DRWN to repay CF3 for legal fees that CF3 allegedly incurred on DRWN's behalf.  The only evidence of this debt was a one page "invoice" dated August 5, 2017, which stated only "commitment legal fees," with $10,000 listed as the amount.  No supporting documents existed to explain this invoice or anything else about this alleged debt, such as whether CF3 had paid legal fees, to whom it had paid legal fees, for what purpose, or why DRWN was obligated to pay them.  DRWN's legal counsel for the Florida lawsuit confirmed that he and his firm did not represent CF3 in the lawsuit, and bank records show that DRWN's legal fees were not paid by CF3 but by one of the other third-party creditors in the Section 3(a)(10) transaction.

30.     The DRWN President never had any communications with CF3 or Fitchett, much less an agreement to pay CF3 for any legal fees.  Further, he had no knowledge of the Section 3(a)(10) lawsuit.

### b.      CF3's Purchases of DRWN's "Debts"

31.     Days after the Silverback-DRWN and INS-DRWN contracts listed above in Paragraph 25 were created, CF3 executed Claims Purchase Agreements with Silverback and INS to purchase DRWN's alleged debts to those two entities.  No money changed hands with the Claims Purchase Agreements, as it was anticipated that CF3 would use proceeds of stock sales to pay for the debts.  On August 16, 2017, only seven days after DRWN allegedly signed the PSA with Silverback, CF3 executed a purchase agreement with Silverback, in which CF3 purchased the $110,000 debt that DRWN purportedly owed to Silverback. There is no evidence that Silverback invoiced DRWN for any work, demanded payment, or that it had performed or even been asked to perform any services for DRWN.

32.     On August 22, 2017, one day after DRWN and INS signed their contract, CF3 executed a Claims Purchase Agreement with INS to buy the alleged $100,000 debt owed under the INS contract.  However, there is no indication that INS performed any services under its agreement with DRWN during the one day that had elapsed, since the agreement was signed on August 21, 2017.  And, INS's owner confirmed that DRWN had no legitimate outstanding debt of $100,000 with INS.

### c.      CF3's Collections Lawsuit Against DRWN

33.     Having purchased the two debts from Silverback and INS, and possessing its own falsified invoice to collect legal fees allegedly owed to it, CF3 filed a lawsuit on September 29, 2017 against DRWN to collect the amounts allegedly owed.  *CF3 Enterprises, LLC v. Quantum Medical Transport, Inc. f/k/a/ A Clean Slate, Inc.*, Case No. 17-018169 (Fla. Broward Cty. Ct. 2017).

Fitchett, on behalf of CF3, alleged in the lawsuit that the debts identified in its complaint were valid and unpaid.

34.     One week later, on October 6, 2017, DRWN purportedly signed a settlement agreement with CF3, in which DRWN agreed that it owed $1,441,000 to other creditors, the ones from whom CF3 had purchased the debts, plus the $10,000 in legal fees allegedly owed to CF3. To resolve CF3's purported claim, DRWN purportedly agreed to transfer to CF3 unrestricted shares in DRWN.

35.     DRWN's President, whose purported signature appears on the settlement agreement, had no knowledge of the lawsuit or the claims that were allegedly owed, and did not sign the settlement agreement.

36.     The settlement agreement between DRWN and CF3 contained numerous representations and warranties.  Two of the warranties, on page 7 of the agreement, stated:

> ... (14) <u>Nature of Claims</u>.  Each Claim in respect of a Third Party Liability is a valid and bona-fide claim against the Company against which Company has no defense and each of the invoices, contracts, or promissory notes underlying each Claim arising from a Third Party Liability accurately represents the nature of the Claim.  All of the goods, services or money underlying the Third Party Liabilities have been fully and satisfactorily received or rendered.  No Claim arising from a Third Party Liability relates to services rendered to promote the Company's securities or to investor relations services.

> (15) <u>Effect of Settlement Agreement</u>. The Company's executive officers and directors have studied and fully understand the nature of the transactions contemplated by this Settlement Agreement….

These representations and warranties were false.

37.     Contrary to these warranties, the Silverback and INS "debts" were not valid past-due debts, but were (at best) contracts for prospective future services.  Furthermore, no apparent evidence exists that the CF3 invoice for legal services was valid.  Unknowingly presented with fake documents and forged signatures, the Florida court approved the settlement agreement,

purportedly between CF3 and DRWN.  On October 19, 2017, the court signed an agreed order accepting the parties' settlement agreement to resolve the lawsuit.

38.     That same day (October 19, 2017), CF3 submitted a request to DRWN's transfer agent to issue 470 million shares of unrestricted DRWN stock to CF3, pursuant to the Section 3(a)(10) transaction.  A few days later, the transfer agent issued the unrestricted DRWN stock to CF3, which was worth $94,000.

39.     On November 20, 2017, CF3 attempted to deposit the unrestricted DRWN stock into CF3's brokerage account.  While the request was pending, Gandy asked Fitchett for the log-in information for CF3's brokerage account so he could check on the deposit of the DRWN stock.  Gandy then accessed CF3's brokerage account multiple times to see if the DRWN stock had been deposited.

40.     Ultimately, the brokerage firm rejected the deposit of the DRWN shares.  By January 2018, the brokerage firm concluded that the transaction was suspicious, and it returned the unrestricted shares of DRWN stock to CF3.

### 2.     The Section 3(a)(10) Transaction for MCIM.

41.     On October 2, 2017, CF3 filed another lawsuit in Florida state court, seeking a fairness hearing under Section 3(a)(10) in order to exchange alleged debt for shares of MCIM stock.  *CF3 Enterprises, LLC v. Macau Capital Investments, Inc.*, Case No. 17-018153, (Fla. Broward Cty. Ct. 2017).  In its lawsuit, CF3 claimed that it was entitled to collect on $4,522,218 in multiple debts that MCIM allegedly owed to various creditors.  CF3 claimed to have purchased these debts from the creditors and, as a result, owned the debts.  At least three of these debts were not *bona fide*, and they involved the same three creditors with non-*bona fide* debts involved in the CF3's lawsuit against DRWN.

42.     MCIM's non-*bona fide* debts included: (i) a September 14, 2017 professional services agreement between Silverback and MCIM ("Silverback-MCIM PSA") in the amount of $4,000,000; (ii) a September 12, 2017, contract with INS for $100,000 worth of advertising services ("INS-MCIM contract); and (iii) an August 8, 2017 invoice from CF3 for $20,000 for "legal fees."

### a.     The MCIM "Debts"

43.     The Silverback-MCIM PSA was signed by Gandy and, allegedly, MCIM's President.  This agreement provided that MCIM had retained Silverback to provide $4 million in services, specifically to "gather personal and business information and to act as a business consultant …."  This was (at best) a contract to perform services in the future and not a debt or current liability of the company.  Further, the Silverback-MCIM PSA provided that MCIM would pay Silverback in future monthly installments of $166,666.66 per month over a 24-month period.  As a result, it was contractually impossible for this to be *bona fide* debt and payable in full in less than one month.  In addition, a single monthly payment under the contract would have exceeded MCIM's *annual* net income, which, in 2016, was $164,698.42.

44.     As he did with DRWN, Gandy facilitated a $100,000 advertising agreement between INS and MCIM.  The INS-MCIM contract was signed by INS's owner and, purportedly, MCIM's President.  As with the INS-DRWN contract, the INS-MCIM contract was forward-looking, providing that INS "will provide" digital marketing services.  And as with the INS-DRWN contract, INS's owner confirmed Gandy was his sole point of contact on the INS-MCIM contract.

45.     Also, as with DRWN, the third non-*bona fide* debt was supplied by CF3 and Fitchett: a falsified invoice to MCIM purportedly for $20,000 for legal services, with no

explanation or supporting documentation as to what that meant or why MCIM owed CF3 such an amount.

46.     The MCIM President whose name appears on the documents denied signing the $4 million Silverback-MCIM PSA, denied signing the INS-MCIM contract, had never seen the $20,000 invoice from CF3 to MCIM, had no dealings with CF3, and did not know Fitchett.

### b.     CF3's Purchases of MCIM's "Debts"

47.     Mere days after the Silverback-MCIM and INS-MCIM contracts listed above in Paragraph 42 were created, CF3 executed Claims Purchase Agreements with Silverback and INS to purchase MCIM's alleged debts to those two entities.  No money changed hands with the Claims Purchase Agreements, as it was anticipated CF3 would use proceeds of stock sales to pay for the debts.  The Claims Purchase Agreements were both dated September 18, 2017, which was four days after the Silverback-MCIM PSA was signed and six days after the INS-MCIM contract was signed.  The MCIM President had no knowledge of these Claims Purchase Agreements. Also, as with DRWN, there is no apparent evidence that Silverback had invoiced MCIM for any work, demanded payment, or that it had performed or even been asked to perform any services for MCIM.  Also, as with DRWN, INS's owner confirmed that MCIM did not have an outstanding debt of $100,000 with INS, because only preliminary communications had occurred in six days since the contract was signed.

### c.     CF3's Collections Lawsuit Against MCIM

48.     On October 2, 2017, CF3 filed another lawsuit in the same Florida county where it had filed the DRWN lawsuit three days earlier, alleging that the debts it had purchased from

MCIM's creditors were valid and unpaid.[2]  *CF3 Enterprises, LLC v. Macau Capital Investments, Inc.*, Case No. 17-018153, (Fla. Broward Cty. Ct. 2017).

49.     On October 6, 2017, MCIM's President purportedly signed a settlement agreement, in which MCIM and CF3 agreed that the lawsuit would be settled and the debts paid through the issuance of unrestricted shares of MCIM stock.  This is the same date that the DRWN President allegedly signed a nearly identical settlement agreement with CF3 in the other lawsuit.  MCIM's President, however, stated that she had no knowledge of this lawsuit (much less the settlement agreement) and did not understand the events related to this lawsuit.

50.     The CF3-MCIM settlement agreement included the same warranties and representations included in the CF3-DRWN settlement agreement.  Specifically, it stated:

> … (14) <u>Nature of Claims</u>.  Each Claim in respect of a Third Party Liability is a valid and bona-fide claim against the Company against which Company has no defense and each of the invoices, contracts, or promissory notes underlying each Claim arising from a Third Party Liability accurately represents the nature of the Claim.  All of the goods, services or money underlying the Third Party Liabilities have been fully and satisfactorily received or rendered.  No Claim arising from a Third Party Liability relates to services rendered to promote the Company's securities or to investor relations services.
>
> (15) <u>Effect of Settlement Agreement</u>. The Company's executive officers and directors have studied and fully understand the nature of the transactions contemplated by this Settlement Agreement….

These representations and warranties were false.

51.     Contrary to these warranties, the Silverback and INS "debts" were not *bona fide* debts, but (at best) contracts for future services.  The CF3 invoice was also not *bona fide*:  there are no apparent documents to support the provision of such legal services, and MCIM's President had no dealings with CF3 and had never met Fitchett.  On November 7, 2017, relying

---

[2]   As with the DRWN lawsuit, CF3's lawsuit to collect on MCIM's debts included other debts that CF3 allegedly purchased from creditors, but the Commission currently has insufficient information to determine whether those were *bona fide* debts.

on the forged and fabricated documents presented to it, the Florida court approved CF3's settlement agreement.

52.     On November 13, 2017, CF3 submitted a request to MCIM's transfer agent to issue to CF3 44,238,665 shares of unrestricted MCIM stock, pursuant to the Section 3(a)(10) transaction and the settlement agreement.

53.     On November 16, 2017, MCIM's transfer agent issued 44,238,665 unrestricted shares of MCIM stock to CF3. At the time of issuance to CF3, the shares had a market value of approximately $4.8 million.

54.     CF3 attempted to deposit the MCIM shares into its brokerage account. However, by January 2018, CF3's brokerage firm concluded that the MCIM transaction, like the DRWN transaction, was suspicious and returned the 44,238,665 shares of MCIM stock to CF3.

55.     CF3 subsequently made two additional requests for shares pursuant to the MCIM 3(a)(10) transaction.   On April 6, 2018, MCIM's transfer agent issued CF3 10 million unrestricted MCIM shares, and, on June 15, 2018, MCIM's transfer agent issued CF3 another 10 million unrestricted shares. On their respective dates of issuance, the 20 million shares had a combined value of approximately $2.2 million.

56.     CF3 later sold 60,238,665 MCIM shares to an overseas buyer. The remaining four million shares, issued as part of the Section 3(a)(10) transaction, were used a few months later in the convertible promissory note transactions, described in more detail below.

C.     **The Backdated Convertible Promissory Note Transactions**

57.     When CF3's brokerage firm rejected CF3's attempts to deposit the unrestricted shares of DRWN and MCIM stock, all of the Defendants turned their attention to a different scheme: selling fraudulent backdated convertible promissory notes. To execute this scheme,

Gandy and Fitchett created new false debts and corresponding fake promissory notes designed to convert the false debt into unrestricted stock.  Gandy had previous experience with this type of scheme: the Commission sued him in 2013 for engaging in a similar fraud and later obtained a final judgment against him.  *SEC v. Robert Gandy, et al.*, No. 4:13-cv-2233 (S.D. Tex.) (Dkt. 44.).

   *1.    The DRWN Convertible Notes*

   58.    Gandy created two false promissory notes purportedly issued by DRWN: (1) a note dated August 17, 2015, to Givens-Gandy (identified as "Kathy Givens"), promising to pay her $40,000, plus 12% interest, on or before August 17, 2016 (the "Givens-Gandy Note"); and (2) a note dated February 19, 2016, to Chang, promising to pay Chang $40,000, plus 12% interest, on or before March 20, 2017 (the "Chang Note").  Both notes purported to repay the $40,000 in funds provided to DRWN by Givens-Gandy and Chang ($80,000 total), which were allegedly deposited into DRWN's bank account on the same dates that the notes were executed. However, neither Defendant actually made a deposit.  A signature purporting to be that of DRWN's President appears on each promissory note, but he did not sign them.  On August 17, 2015, and February 19, 2016, the dates that each note was purportedly issued, the DRWN reverse merger had not occurred, and the person who allegedly became DRWN's president had not even been publicly identified as such.

   59.    On June 6, 2018, Givens-Gandy sold a portion of the Givens-Gandy Note, worth $32,500, to a third-party investor.  Included as supporting documents in that sale were additional false and/or fabricated documents: (1) a Securities Transfer Agreement signed by Givens-Gandy, in which she purported to assign $32,500 of the fake $40,000 promissory note to the third-party investor; and (2) a bank deposit slip, dated August 17, 2015, purporting to show a $40,000 wire

transfer from her bank account to DRWN.  The deposit slip was falsified, as Givens-Gandy maintained no account at the bank from which she purportedly wired the money to DRWN, and the bank has no record of this transaction.

60.     Thereafter, the third-party investor elected to convert $17,598 of the note into unrestricted shares of DRWN stock.  On or about June 14, 2018, the third-party investor forwarded the Givens-Gandy Note to its attorney to obtain a legal opinion for DRWN's transfer agent, regarding the transferability of stock that would result from the note's conversion.

61.     Relying on the false note, the false bank deposit slip, and the false Security Transfer Agreement, the third-party investor's attorney prepared an opinion letter on the transferability of the shares of stock to be issued on conversion, pursuant to Section 4(a)(1) of the Securities Act.  The attorney's letter, sent to DRWN's transfer agent, opined that the shares could be issued "without a restrictive legend" and that the "[s]hares derived from converted debt that dates to August 2015."

62.     Because she never wired $40,000 to DRWN (and never maintained an account at the bank from which the $40,000 allegedly came), Givens-Gandy knew, or was severely reckless in not knowing, that she never wired $40,000 to DRWN and that the promissory note and underlying debt were bogus.  She also knew, or was severely reckless in not knowing, that the third-party investor forwarded false documents to his attorney for a legal opinion.

63.     On July 26, 2018, the third-party investor received 502,807,315 unrestricted shares of DRWN stock.  Subsequently, the investor sold enough shares to pay Givens-Gandy the $17,598 it agreed to pay her for the note.  On that same day (July 26, 2018), Givens-Gandy received $17,598 in her bank account.  The beneficiary information referenced in the wire transfer to her account stated "DRWN PARTIAL CONVERSION."  Immediately after receiving

that deposit, and also on July 26, 2018, Givens-Gandy wired $16,000 to a different bank account she controlled, styled Silverback Promotions Trust I.

64.      With respect to the promissory note purportedly issued by DRWN to Chang on February 19, 2016, Chang sold that note on March 21, 2018 to a third-party investor for $40,000. Included as supporting documents for that sale were additional false and/or fabricated documents: (1) an Assignment of Promissory Note ("Assignment"), signed by Chang, in which he assigned all of the original $40,000 promissory note to the third-party investor; and (2) a bank deposit slip, dated February 19, 2016, purporting to show a $40,000 transfer to DRWN that originated from Chang's bank account.  The deposit slip was falsified, as Chang maintained no account at the bank from which he purportedly wired the $40,000 to DRWN, and the bank has no record of the transaction.

65.      Thereafter, the third-party investor elected to convert the entire principal amount of $40,000 into unrestricted shares of DRWN stock.  On or about March 23, 2018, Chang's third-party investor forwarded the promissory note to its attorney to obtain a legal opinion to satisfy DRWN's transfer agent that the stock resulting from the note's conversion should be unrestricted.

66.      Relying on the false note, the false bank deposit slip, and the false Assignment, the third-party investor's attorney prepared an opinion letter on the transferability of the shares of stock to be issued on conversion, pursuant to Section 4(a)(1) of the Securities Act.  The attorney's letter, sent to DRWN's transfer agent, opined that the shares "are free trading and may be sold by the Shareholder pursuant to Section 4(a)(1) without restriction."

67.      Because Chang never wired $40,000 to DRWN (and never maintained an account at the bank from which the $40,000 was allegedly wired to DRWN), Chang knew, or was

severely reckless in not knowing, that the note and underlying debt were false and that the third-party investor had forwarded false documents to its attorney for a legal opinion.

68.     On March 26, 2018, DRWN's transfer agent issued to Chang's third-party investor 100 million unrestricted shares of DRWN stock.  On June 15, 2018, the transfer agent issued to the third-party investor another 165 million unrestricted shares of DRWN stock.  On March 27, 2018, the third-party investor wired Chang $40,000.  The beneficiary information referenced in the wire transfer stated "DRWN DEBT PURCHASE."

### 2.     CF3 Backdated Promissory Note

69.     Similar to the scheme related to DRWN stock described in paragraphs 58 through 68 above, CF3 engaged in a scheme with MCIM stock.  On March 17, 2016, CF3 and MCIM allegedly entered into an "Original Issue Discount Convertible Promissory Note" (hereinafter "Discount Note"), with a face amount of $2,285,937, but for the purchase price of $1,800,000.  By the terms of the note, CF3 purportedly paid MCIM $1,800,000 on February 19, 2016, and MCIM promised to repay $1,800,000 by March 17, 2017.  MCIM could prepay the Discount Note by paying CF3 $2,285,937 before March 17, 2017.  But if MCIM failed to prepay the note, CF3 could elect to not receive the $1,800,000 owed to it on March 17, 2017, and instead choose to convert the Discount Note 120 days later into unrestricted shares of MCIM stock.

70.     However, the Discount Note was a fraud.  CF3 never wired $1.8 million to MCIM.  Also, on March 17, 2016, the date of the Discount Note, the MCIM President who allegedly signed the note was not at that time MCIM's president, since the reverse merger during which she became MCIM's President did not close until October 4, 2017.  Further, MCIM's President had no knowledge of the Discount Note and did not know Fitchett, who had signed it on behalf of CF3.

71.     Subsequently, Fitchett used the Discount Note to obtain unrestricted shares of MCIM stock.  On June 11, 2018, CF3 and a third-party investor entered into a Stock Purchase Agreement, in which CF3 sold the investor two million unrestricted shares of MCIM stock.  Two days later (June 13, 2018), the third-party investor forwarded the forged Discount Note and a falsified deposit slip, purporting to show the $1.8 million deposit into MCIM's account, to its attorney on the transferability of the MCIM stock.

72.     The deposit slip sent to the third-party investor's attorney that purported to show that CF3 wired $1.8 million to MCIM was falsified.  The bank from which it allegedly came confirmed that the wire transfer document was not legitimate.  In addition, CF3 did not even have an account at that particular bank.  Furthermore, on March 17, 2016, the date of the alleged wire transfer, it was impossible for CF3 to have wired $1.8 million to MCIM because the balance in its actual bank account was approximately $29.

73.     Relying on the false documents, the third-party investor's attorney prepared an opinion letter related to the transferability of the shares, pursuant to Section 4(a)(1) of the Securities Act.  The attorney's letter, sent to MCIM's transfer agent, opined that the MCIM shares "may be issued without a restricted legend and sold pursuant to Section 4(a)(1)."

74.     CF3 and Fitchett knew, or were severely reckless in not knowing, that they had never paid MCIM $1.8 million, that the Discount Note was false, and that the third-party investor had forwarded false documents to its attorney to obtain a legal opinion.

75.     On June 26, 2018, MCIM's transfer agent, based on the legal opinion supported by false documents, transferred two million unrestricted shares of MCIM stock from CF3 to the third-party investor.

76.     On July 11, 2018, the third-party wired $25,000 to CF3.  The wire confirmation stated that the funds were "CF3 FROM [third party investor]."  That same day, CF3 wired $10,000 to Silverback and Gandy.  The following day (July 12, 2018), CF3 wired another $10,000 to Silverback and Gandy.

77.     On July 20, 2018, CF3 sold another two million shares to the same third-party investor.  The same false documents used to support the first two-million share transfer were used again to support this second transfer.

78.     On August 3, 2018, the third-party wired $25,000 to CF3 for the purchase of this second tranche of two million MCIM shares.  On August 6, 2018, CF3 wired $20,000 to Silverback and Gandy.

## VI.
## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and  10b-5(c) Thereunder
### Fraud in Connection with the Purchase or Sale of Securities

#### (Against All Defendants)

79.     Plaintiff repeats and incorporates by reference paragraphs 1 through 78 of this Complaint as if set forth verbatim herein.

80.     By engaging in the conduct described above, Defendants Gandy, Silverback, Fitchett, CF3, Givens-Gandy, and Chang, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange have: (i) employed a device, scheme, or artifice to defraud; and/or (ii) engaged in an

act, practice, or course of business that operates or would operate as a fraud or deceit upon any person.

81.     Defendants Gandy, Silverback, Fitchett, CF3, Givens-Gandy, and Chang engaged in the above-referenced conduct knowingly or with severe recklessness.

82.     By engaging in the conduct described above, Defendants Gandy, Silverback, Fitchett, CF3, Givens-Gandy, and Chang violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

**SECOND CLAIM**
**Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act**
<u>**Fraud in the Offer or Sale of Securities**</u>

**(Against All Defendants)**

83.     Plaintiff repeats and incorporates by reference paragraphs 1 through 78 of this Complaint as if set forth verbatim herein.

84.     By engaging in the conduct described above, Defendants Gandy, Silverback, Fitchett, CF3, Givens-Gandy, and Chang, directly or indirectly, singly or in concert with others, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange: (i) employed a device, scheme, or artifice to defraud; and/or (ii) engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

85.     With respect to violations of Section 17(a)(1) of the Securities Act, Defendants acted knowingly or with severe recklessness.  With respect to violations of Sections 17(a)(3) of the Securities Act, Defendants were at least negligent in their actions.

86.     For these reasons, Defendants Gandy, Silverback, Fitchett, CF3, Givens-Gandy, and Chang, violated, and unless enjoined will continue to violate, Section 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

(1)     Find that Defendants committed the violations alleged in the Complaint;

(2)     Permanently enjoin Defendants from future violations of Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

(3)     Permanently enjoin Gandy and Fitchett from directly or indirectly, including but not limited to, through any entity owned or controlled by Gandy and Fitchett, participating in the offer or sale of securities pursuant to, or claiming an exemption under, Section 3(a)(10) of the Securities Act;

(4)     Permanently enjoin Fitchett from participating in any offering of a penny stock, including acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock under Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act;

(5)     Order each Defendant to disgorge all ill-gotten gains obtained as a result of conduct alleged herein, with prejudgment interest, including on a joint and several basis between Silverback and Gandy, and on a joint and several basis between CF3 and Fitchett;

(6)     Order each Defendant to pay a civil penalty, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)]; and

(7)     Grant such other and further relief as the Court may deem just, equitable, and

proper.

DATED:  November 9, 2021                    Respectfully submitted,

*/s/ Janie L. Frank*
JANIE L. FRANK
Attorney-in-Charge
Texas Bar No. 07363050
SDTX No.  426174

SECURITIES AND EXCHANGE COMMISSION
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry St., Unit #18
Fort Worth, TX 76102-6882
(817) 978-6478 (jlf phone)
(817) 978-4927 (facsimile)
frankj@sec.gov